UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

PATRICIA DELFIN,

|                        |                        |
|------------------------|------------------------|
| Plaintiff,             | **COMPLAINT & JURY DEMAND** |
| -against-              |                        |
|                        | **21CV4770**           |

CITY OF NEW YORK, MAYOR BILL di BLASIO;
NYPD COMMISSIONER DERMOT SHEA, NYPD
CHIEF OF DEPARTMENT TERENCE MONAHAN,
JOHN DOE POLICE OFFICERS #1-10,

Defendants.

-------------------------------------------------------------------- x

## PRELIMINARY STATEMENT

1.    This is a civil rights action in which Plaintiff seeks relief through 42 U.S.C. § 1983 for the violation of her First, Fourth and Fourteenth Amendment rights, and the laws and Constitution of the State of New York.

2.    Throughout the Spring and Summer of 2020, thousands of Americans participated in protests across our nation in response to the murder of George Floyd and other horrific instances of police brutality.

3.    As a way to voice their outrage and to hopefully bring about change, many New Yorkers marched through the streets of our City in peaceful protests.  The marches brought our citizens together to exercise their fundamental right to free speech and assembly.

4.    The NYPD repeatedly turned these peaceful protests into violent encounters in which New Yorkers were attacked, abused and often arrested without justification.  Officers were suited with riot gear and batons, instructed to surround peaceful protesters, (a tactic known as

kettling), and without warning, ordered to charge the protesters with batons.[1]

5.     The City and the NYPD not only condoned the violence but encouraged it.   The hundreds of New Yorkers injured in the wake of such sanctioned violence was foreseeable and inevitable.

6.     The defendants carried out one such operation on May 29, 2020, when plaintiff Patricia Delfin joined a peaceful march passing by her home in the Clinton Hill section of Brooklyn.   The group was chanting the names of the many recent victims of police brutality and raising their voices in protest against widespread injustices experienced by Black Americans.   Within a few blocks, Ms. Delfin and the others were surrounded by officers dressed in riot gear.   Once the protesters were trapped, the officers charged without warning.   An NYPD officer struck Ms. Delfin in the face with his baton causing her to bleed profusely.

7.     On May 29, and in the protests that continued throughout the summer, the NYPD didn't care about the rights of the people they were sworn to protect and didn't care about the rights guaranteed under our constitution.   Instead, the NYPD used violence to scare and intimidate the protesters into silence.

8.     Plaintiff seeks monetary damages (special, compensatory, and punitive) against Defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction under 28 §§ 1331, 1343(a), and 1367(a).

10.     Venue lies in the Eastern District of New York because plaintiff was assaulted by the

---

[1] Allison McCann, Blacki Migliozzi, Andy Newman, Lary Buchanan and Aaron Byrd, N.Y.P.D. Says It Used Restraint During Protests.  Here's What the Videos Show, N.Y. Times (June 13, 2020), available at https://www.nytimes.com/interactive/2020/07/14/nyregion/nypd-george-floyd-protests.html.  The videos of NYPD officers using unprovoked and unjustified force against peaceful protesters both on the night of the incident underlying this complaint and throughout May and June of 2020 are here incorporated.

defendants in Brooklyn.

## **PARTIES**

11.    Plaintiff Patricia Delfin is a 38 year-old woman and a resident of Kings County, New York.

12.    The City of New York ("City") is a municipal corporation organized under the laws of the State of New York.  At all times relevant hereto, Defendant City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention, and conduct of all NYPD personnel.  In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

13.    Defendant Bill de Blasio is the Mayor of the City of New York, whose workplace is at City Hall in Manhattan.  At all times here relevant, he was the chief policymaking and decision-making official with respect to City matters generally, including NYPD matters. He is sued in his individual and official capacities.

14.    Defendant Dermot Shea is the Commissioner of the NYPD, a civilian position, whose workplace is at One Police Plaza in Manhattan.  He has final policymaking and decision-making authority with respect to the NYPD and responsibility for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the NYPD. He is sued in his individual and official capacities.

15.    Defendant Terence Monahan is the Chief of Department of the NYPD whose workplace is at One Police Plaza in Manhattan. As the highest-ranking uniformed officer of the

NYPD, Chief Monahan has been delegated final policymaking authority with respect to NYPD policies, including, but not limited to, those related to management of protests, use of force, and arrests. He is sued in his individual and official capacities.

16.     John Doe Officers #1-10 are NYPD uniformed members of the service whose identities are unknown at this time and who, upon information and belief, were assigned to various NYPD precincts throughout Brooklyn.  Defendant officers were at all times here relevant police officers of the NYPD, and as such were acting in the capacities of agents, servants, and employees of the City of New York.  They are sued in their individual capacities.

17.     At all times here mentioned Defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## NOTICE OF CLAIM

18.     Within 90 days of the events giving rise to these claims, plaintiff filed a written Notice of Claim with the New York City Office of the Comptroller.  Over 30 days have elapsed since the filing of the Notice, and this matter has not been settled or otherwise disposed of.

## FACTUAL BACKGROUND

### The Violent History of NYPD Response to Protests

19.     The NYPD's violent and unconstitutional response to the 2020 marches is part of its long history of aggressively and unconstitutionally policing protests.

20.     For example, the New York Civil Liberties Union ("NYCLU") documented unconstitutional practices used during protests at the 2004 Republican National Convention ("RNC").  The NYCLU received over 200 complaints from witnesses at the RNC protests and published on its website a report finding that the NYPD used crowd control techniques, such as

indiscriminately trapping protesters, that led to hundreds of illegal arrests of peaceful demonstrators and bystanders.[2]

21.   In connection with the litigation that followed, Judge Richard Sullivan, now with the Court of Appeals for the Second Circuit, concluded that defendant Monahan's actions at the RNC were unconstitutional and entered summary judgment against him for mass arrests lacking probable cause.   Monahan was later promoted to Chief of Department and responsible for overseeing the NYPD's response to all protests.

22.   The Civilian Complaint Review Board ("CCRB") also received and investigated many complaints stemming from the police response to the RNC protests.   Based on those investigations, the CCRB wrote directly to the then police commissioner recommending he improve officer training in connection with policing demonstrations to avoid improper mass arrests in the future.[3]

23.   In 2011, the NYPD again used violence and mass arrests to quell the Occupy Wall Street ("OWS") demonstrations in downtown Manhattan.   A year later, the Protest and Assembly Rights Project widely disseminated a 2012 report detailing 130 complaints of excessive or unnecessary force against protesters, bystanders, lawyers, legal observers, and journalists.   These claims included the repeated use of kettling against peaceful protesters which "inflamed tensions," "caused confusion and panic," and "chilled ongoing and future protest activity."[4]

24.   After the 2004 RNC protests and 2011 Occupy Wall Street protests discussed above, many lawsuits were filed against the NYPD detailing the unnecessary and excessive force used against peaceful protesters, bystanders, legal observers and journalists and the unjustifiable

---

[2] https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf
[3] https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/20060509_recomm-rnc.pdf
[4] https://cdn.theatlantic.com/static/mt/assests/politics/Suppressing%20Protest.pdf

detaining and kettling of protesters.[5]

25.    In the years since the RNC and OWS demonstrations, the CCRB has continued to substantiate numerous complaints that NYPD Officers used excessive force in violation of NYPD's use of force policy, including 30 allegations involving pepper spray; 17 involving batons; and 38 involving body strikes of physical force.  In total, the CCRB substantiated 471 allegations of excessive force between 2013 and 2019 against NYPD Officers who were still employed as officers on May 29, 2020.

26.    Despite the CCRB's findings, the police commissioner rarely concurs with the recommended discipline.  In 2019, for example, the police commissioner only disciplined 21% of officers who the CCRB substantiated serious allegations against.  Defendants failure to discipline officers for the use of excessive force, unlawful detention and arrests, and other unconstitutional actions have ensured that these same and other officers continue engaging in such other unconstitutional actions during protests.

27.    Among those many complaints made to the CCRB in the years prior to the BLM protests, were complaints about one specific group of officers who worked within a special NYPD unit called the Strategic Response Group ("SRG").  The SRG was created in 2015 as a specialized unit that was meant to handle counter terror matters in NYC.  However, since its inception, the SRG has been routinely deployed to protests, including those in the Spring and Summer of 2020.

28.    Defendants Commissioner Shea, Chief of Department Monahan and Mayor de Blasio knew that NYPD officers would confront demonstrators protesting police brutality and that

_____

[5] See, e.g., Dekuyper v.City of New York, 15CV10080 (NRB); Lynch v. City of New York, 952 F.3d 67 (2d Cir. 2020); Macnamara v. City of New York, 04CV9216, 2007 WL 3196295 (S.D.N.Y. Oct. 30, 2007); Marlin v. City of New York, 15CV2235(CM), 2016 WL 7335662 (S.D.N.Y. September 7, 2016); Douglas v. City of New York, 14CV8124 (S.D.N.Y.), No. 17-1264 (2d Cir. Apr. 5, 2018).

NYPD police officers previously mishandled demonstrations and protests with excessive force and unlawful arrests.  Defendants knew that the NYPD lacked sufficient training to police lawful First Amendment protest activity and that deploying these insufficiently trained officers would lead to the deprivation of plaintiffs' constitutional rights.  Despite this knowledge, they continued to deploy large numbers of inadequately trained police officers to peaceful demonstrations, resulting in excessive force and unlawful arrests.

<u>The NYPD's Use of Violence at Black Lives Matter Protests</u>

29.   Throughout the BLM protests in Spring and Summer of 2020, the defendants were aware that NYPD officers were improperly trained and were using excessive force to suppress the protesters' right to voice their opinion about police reform.  The NYPD's general response to these BLM demonstrations was according to its custom of kettling protesters and then charging into the group with violence.

30.   Despite the many prior complaints made against members of the SRG unit, the defendants made the decision to deploy those same officers to suppress the BLM protests.[6]  With a history of violence at protests and with an utter lack of training, SRG violence against citizens, like the one detailed here, was both foreseeable and inevitable.  SRG members were sent to intimidate protesters and illegally suppress their free speech through violence and false arrests.

31.   In the very first week of the protests, the CCRB received 633 complaints of police brutality.   A spokesman for the CCRB said, as the protests continued into the summer, that number climbed to over 750 allegations of police brutality and abuse of power.

32.   On June 3, Ali Watkins, reporting for the New York Times, observed the kettling of protesters by NYPD officers at a rally near Cadman Plaza in Brooklyn. Police officers penned

---

[6] https://theappeal.org/nypd-srg-misconduct/

protesters with their bodies in close quarters and then the police advanced on protesters. Watkins described the scene: "For the next 20 minutes in Downtown Brooklyn, officers swinging batons turned a demonstration that had been largely peaceful into a scene of chaos."[7]

33.    The New York State Attorney General's Office was tasked with investigating and ultimately reporting on the police response to the 2020 protests. The AG conducted hundreds of interviews, reviewed hours of video footage of police and civilian interactions and hosted a public hearing which included statements from protesters, observers and Commissioner Shea. The Preliminary Report was issued in July 2020 and details repeated and widespread violence of officers against peaceful protesters including kettling and baton strikes.[8]

34.    At the request of Mayor di Blasio, the Department of Investigation investigated the police response to the BLM demonstration. The DOI December 2020 report found that the "NYPD's use of force on protesters—encirclement (commonly called 'kettling'), mass arrests, baton and pepper spray use, and other tactics—reflected a failure to calibrate an appropriate balance between valid public safety or officer safety interests and the rights of protesters to assemble and express their views."[9]

35.    Many lawsuits have been filed on behalf on individuals who were assaulted and falsely arrested by the NYPD during the BLM demonstrations in 2020.[10] These complaints detail both the history of NYPD violence in reaction to mass demonstrations and the NYPD violence in reaction to the BLM protests of 2020. Several complaints detail the NYPD policy of kettling protesters and the subsequent unlawful arrests and excessive force of the officers.

---

[7] https://www.nytimes.com/2020/06/05/nyregion/police-kettling-protests-nyc.html
[8] https://ag.ny.gov/nypd-protest-response
[9] https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf
[10] *See, e.g. Sierra v. City of New York* 20 Civ. 10291 (S.D.N.Y.); *Gelbard v. City of New York* 20 Civ. 3163 (E.D.N.Y.); *Payne v City of New York* 20 Civ. 8924 (S.D.N.Y.); *Sow v. City of New York* 21 Civ. 533 (S.D.N.Y.); *People v. City of New York* 21 Civ. 322 (S.D.N.Y.).

36.     The complaint filed in *Gelbard v. City of New York*, 20 Civ.3163 (E.D.N.Y.), describes several incidences of the NYPD surrounding protesters and violently assaulting and arresting protesters.

37.     The amended complaint filed in *Payne v. de Blasio*, 20 Civ. 8924(S.D.N.Y.), describes what one plaintiff suffered through at a June 4 rally in the Mott Haven section of the Bronx.  She describes officers confining a group of peaceful protesters and then assaulting them indiscriminately with batons.  The crowd was pushed so tightly together that it was impossible to move out of the officers' path or to help those who had been injured. *Payne* A.C. ¶¶182-185.

38.     The amended complaint in *Sierra v. City of New York* 20 Civ. 10291 (S.D.N.Y.) describes several plaintiffs being innocently swept up when NYPD kettled protesters into a tight group and then assaulted them with pepper spray and batons.  *Sierra* A.C. ¶¶88-120.

39.     Mayor di Blasio, Commissioner Shea and Chief Monahan are aware of, and perpetuate, the NYPD's custom of using excessive force in response to large protests in NYC; a custom which is widespread, longstanding and well documented.

<u>The NYPD's Assault of Plaintiff</u>

40.     On May 29, 2020, at approximately 9:35PM, Ms. Delfin and her partner decided to join a group of people marching in her Brooklyn neighborhood against police brutality.  They hadn't planned to join the protest but decided to walk amongst their neighbors after hearing the moving and passionate chants coming from the marchers as they passed by their home.  They grabbed their masks and headed outside.

41.     They met up with the protesters near Classon and Gates Aves. and began walking on Classon towards Lafayette Ave.

42.     As the group approached Lafayette Ave., there was a large police presence blocking

Classon which prevented the protesters from continuing forward.  The officers stood shoulder to shoulder, wearing helmets and holding batons.  The street behind the officers was filled with police vehicles.

43.   The protesters, including plaintiff, stood in the intersection chanting the names of the victims of police brutality and pleading for justice.  The voices were loud and angry but there was no violence or threatening behavior.

44.   Another large police vehicle approached the crowd from behind; the protesters were now surrounded.

45.   At approximately 10:10PM, the NYPD officers, including John Does #1-10, lifted their batons and shields and angrily charged the protesters.  There was no warning.  The protesters were in shock as they were physically pushed backward and unintentionally falling into one another.

46.   A few moments later, the officers stopped their forward assault and realigned themselves in a tighter formation.  This gave Ms. Delfin and the others just a few moments to collect themselves; plaintiff had lost a shoe in the attack and was searching for it on the street.

47.   The officers were now several men deep when they again, without warning, violently charged the crowd.  Several officers gripped their batons on each end with their fists and slammed into the crowd while other officers violently pushed into the group with their riot shields.

48.   An NYPD officer smashed his baton into Ms. Delfin's face, just above her eyebrow.

49.   Plaintiff fell back into the others but everyone had been so jammed together by the officers that there wasn't much room for her to move.  The officers continued their push forward causing plaintiff to be pummeled by the momentum of the crowd until she was slammed into a

parked car.  She managed to roll across the hood of the car and fall to the curb on the other side.
Her partner used his body to shield her from further attack by the officers while he cried out for
help.

50.    On the ground, Ms. Delfin realized that her entire face was covered in blood and there
was a pool of blood on the ground next to her.  It was hard for her to see.  Her mask was soaked
with blood and now unusable.  She reached up and felt a gaping wound on her forehead.

51.    Her partner managed to pick her up once the officer assault stopped.   One officer
pointed them toward the FDNY ambulance that was parked on Classon.  They made their way to
the ambulance but the officers gathered there refused to help or allow her to receive emergency
medical attention.  One officer pointed down the street and said, "the hospital is that way."

52.    Plaintiff walked the several blocks back to her home despite feeling weak and dizzy.
Her partner took her to Methodist Hospital but, because of the ongoing pandemic, Ms. Delfin
had to enter the hospital and receive care alone.  She received several sutures to close the wound
to her head.

53.    That same night, Ms. Delfin began to experience dizziness, blurry vision and headaches
which got progressively worse over the following days.  These post concussive symptoms lasted
for weeks after the incident and included fatigue, nausea and confusion.  It became impossible
for her to run her business or care for her three school aged children.  Plaintiff continues to
struggle both physically and emotionally from the trauma of the officer's baton strike.

54.    At all times during the events described above, the defendant officers were engaged in a
joint venture and formed an agreement to violate plaintiff's rights.   The individual officers
assisted each other in performing the various actions described and lent their physical presence
and support and the authority of their office to each other during said events.  They failed to

intervene in the obviously illegal actions of their fellow officers against Plaintiff.

55.    During all of the events above described, defendants acted maliciously and with intent to injure plaintiff.

## DAMAGES

56.    As a direct and proximate result of the acts of defendants, plaintiff suffered the following injuries and damages:

    a.  Violation of her rights pursuant to the First, Fourth and Fourteenth Amendments to the United States Constitution;

    b.  Violation of her rights under Article I of the New York State Constitution;

    c.  Physical pain and suffering;

    d.  Emotional trauma and suffering, including fear, embarrassment, humiliation, frustration, extreme inconvenience, shame, and anxiety.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983-4th Amendment

57.    The above paragraphs are here incorporated by reference.

58.    By striking plaintiff in the face with a baton, defendants used excessive force against her, and failed to intervene in each other's obviously illegal actions.

59.    Defendants have deprived plaintiff of her civil, constitutional and statutory rights and have conspired to deprive her of such rights and are liable to plaintiff under 42 U.S.C. § 1983.

60.    Plaintiff was damaged as a result of defendants' wrongful acts.

## SECOND CAUSE OF ACTION
### 42 U.S.C. §1983-1ST Amendment

61.    The above paragraphs are here incorporated by reference.

62.    Defendants' actions violated plaintiff's rights to speech, expression, and to assemble in violation of the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

63.    Plaintiff was damaged as a result of defendant's wrongful acts.

### THIRD CAUSE OF ACTION
Assault and Battery

64.    The above paragraphs are here incorporated by reference.

65.    By charging plaintiff with riot shields and batons, striking plaintiff in the face with a baton, and shoving plaintiff violently into other protesters, defendants made plaintiff fear for her physical well-being and safety and placed her in apprehension of immediate harmful and offensive touching.

66.    Defendants engaged in and subjected plaintiff to immediate harmful and offensive touching and battered her without her consent.

67.    As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiff sustained the damages described above.

### FOURTH CAUSE OF ACTION
Municipal Liability

68.    The facts pleaded above describe the policies, practices, and customs Defendants subjected the plaintiff to, including, but not limited to: uses of excessive force, and false arrests, and unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair warning; employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protesters, without fair warning.

69.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including, but not limited to, Defendant de Blasio, Defendant Shea, and Defendant Monahan; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive

as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, Defendant de Blasio, Defendant Shea, Defendant Monahan, and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

## FOURTH CAUSE OF ACTION
### Respondeat Superior

70.    The above paragraphs are here incorporated by reference.

71.    Defendants' tortious acts were undertaken within the scope of their employment by defendant City of New York and in furtherance of the defendant City of New York's interest.

72.    As a result of Defendants' tortious conduct in the course of their employment and in furtherance of the business of defendant City of New York, Plaintiff was damaged.

## FIFTH CAUSE OF ACTION
### NYS Constitutional Violations

73.    The above paragraphs are here incorporated by reference.

74.    The Defendants acting under the color of law, violated plaintiff's rights under the New York State Constitution Article 1 §§ 6, 8, 9, 11 and 12.

75.    A damages remedy here is necessary to effectuate the purposes of Article 1 §§ 6, 8, 9, 11 and 12 of the NYS Constitution and appropriate to ensure full realization of plaintiff's rights under those sections.

76.    As a result of the foregoing, plaintiff was deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs and expenses and was otherwise damaged and injured.

77.    The unlawful conduct of the defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

    a.    On each claim detailed above, compensatory and punitive damages in sums which exceed the jurisdictional limits of all lower courts, plus costs, disbursements and reasonable attorneys' fees;

    b.    For such other relief as this court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


DATED:        August 21, 2021

Respectfully yours,

Nicole Bellina, Esq.
Stoll, Glickman & Bellina, LLP
5030 Broadway Suite 652
New York, NY 10034
(718) 852-3710
nbelllina@stollglickman.com

TO:
City of New York
100 Church St.
New York, NY 10007

Commissioner Shea
Chief of Department Monahan
1 Police Plaza
New York, NY 10038